IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:12-CR-0243** |
| **v.** | : | **JUDGE SYLVIA H. RAMBO** |
| **CARLOS C. HILL** | : | |

# M E M O R A N D U M

   In this criminal case, Defendant was charged with two counts related to his alleged possession of a firearm in the Middle District of Pennsylvania. (Doc. 1.)[1] Presently before the court is Defendant's motion to suppress, in which he seeks to suppress two out-of-court photo array identifications made by the alleged victim.[2] For the reasons stated herein, Defendant's motion to suppress will be denied.

## I.  Background

   On September 26, 2012, Carlos C. Hill ("Defendant") and Elijah U. Brown, Jr., ("Brown") were each charged with two counts related to an incident involving an unlawful handgun. (*See* Doc. 1.)[3] On January 29, 2013, Defendant filed a motion to suppress (Doc. 48) and brief in support (Doc. 49), which requested

---

  [1] The two counts contained in the September 26, 2012 indictment are as follows: (1) Count 1- possession of a firearm by a previously convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(e); and (2) Count 2- possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2). (Doc. 1.)

  [2] Additionally, Defendant seeks to preclude the victim from making an in-court identification consistent with her out-of-court identification as "fruit of the impermissibly suggestive out-of-court identification." (*See* Doc. 48 at ¶ 12.)

  [3] Although the indictment charges both Hill and Brown with the same offenses, and the two defendants are, at this time, to be tried jointly, the instant motion to suppress pertains only to Hill.

that the court suppress two out-of-court identifications of Defendant made by the alleged victim, Tamela Corish ("Corish"). The basis for Defendant's motion was as follows:

> 9.    [Defendant] seeks suppression of the identification made from the photo arrays because it was impermissibly suggestive and there is a substantial likelihood of misidentification.
>
> 10.   [Defendant] asserts that the arrays shown to the "victims" were of individuals who were not sufficiently similar as to make the identification reliable.
>
> 11.   [Defendant] also asserts that the description gave by the "victims" did not match the individuals selected for the photo array. *Manson v. Brathwaite*, 432 U.S. 98, 113-114 (1977); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).
>
> 12.   [Defendant] also moves this Honorable Court to suppress any in-court identification as fruit of the impermissibly suggestive out-of-court identification procedures.

(Doc. 48 at ¶¶ 9-12.) On February 11, 2013, the court conducted a suppression hearing on Defendant's motion.[4] Based upon the following facts established at the hearing and the court's independent assessment of the two photo arrays at issue, the court finds that neither the arrays themselves nor procedures utilized in connection therewith were unnecessarily suggestive, and concludes that the totality of the

---

[4] Citations to the February 11, 2013 hearing are to a rough version of the transcript. Accordingly, citations to page numbers may vary as compared to the final version.

2

circumstances would otherwise establish the independent reliability of the identifications.

**II.**     <u>**Findings of Fact**</u>

Harrisburg Bureau of Police Detective Timothy Carter ("Detective Carter"), who was one of the detectives involved with the investigation of the incident giving rise to the instant charges, testified on behalf of the government at the suppression hearing regarding the circumstances surrounding the initial identification. On July 13, 2012, Detective Carter joined the investigation into an incident arising at the City Gas and Diesel station, located on State Street in the City of Harrisburg, involving the theft of Corish's motor vehicle, during the course of which a person involved in the theft had threatened Corish and her boyfriend, Rodney Nicholson ("Nicholson"), with a silver handgun. (Hr'g Tr. at p. 2-3.) At approximately 1:50 a.m. on July 13, 2012, Officer Anthony Fiore of the Harrisburg City Police Department was dispatched to the 1600 block of Park Street in response to an emergency call placed by Corish. (Def. Ex. 101.) During an interview that occurred several hours after the incident, Corish told Detective Carter that, in the early morning of July 13, 2012, she met Nicholson at the City Gas and Diesel station. (Def. Ex. 104.) Corish and Nicholson had driven separately; Corish drove Nicholson's vehicle, and Nicholson drove Corish's Dodge Stratus. (*Id*.) Nicholson and Corish exited their vehicles. (*Id*.) Upon exiting, Nicholson did not remove the keys from the ignition of the Dodge Stratus. (*Id*.) Corish noticed a green SUV enter the parking lot of the gas station, and subsequently witnessed an individual exit the

green SUV, enter Corish's Dodge Stratus, and drive the Dodge Stratus out of the gas station's parking lot, followed by the green SUV. (*Id.*)[5]

Corish and Nicholson reentered Nicholson's vehicle and pursued the green SUV to the 1600 block of Park Street, at which time they witnessed two individuals exit the green SUV. (*Id.*; *see also* Def. Exs. 101 & 102.) Corish and Nicholson exited Nicholson's vehicle and confronted the two individuals regarding the location of the Dodge Stratus. (Def. Ex. 101.) Initially, the two individuals attempted to verbally dismiss Corish and Nicholson's inquiries. (Def. Ex. 104.) However, Corish and Nicholson continued to question the two individuals, at which point one of the individuals displayed a silver handgun and threatened that, if Corish and Nicholson did not leave the area, they would be harmed. (*Id.*; *see also* Def. Exs. 101 & 102.) Corish then called 911. (Def. Ex. 108, Track 1.)

In response to Corish's emergency call (Def. Ex. 108), Harrisburg City police officers located the green SUV parked on the 1600 block of Park Street,[6] at which time the officer in charge directed the vehicle be towed to the police station (Def. Ex. 101). The green SUV was registered to Robert Hearn ("Hearn"), who resided at 1624 Park Street. (Def. Exs. 102 & 103.)

Later that day, Officer Christopher Krokos arrived at Hearn's residence to gather additional information regarding the incident. (*See* Def. Ex. 102.)

---

[5] Upon review of the record, the court acknowledges that there are several discrepancies in Corish's statements to law enforcement officers. However, these discrepancies are immaterial for the disposition of the motion *sub judice*.

[6] Although the report of Officer Fiore indicates that the green SUV was found on the 1600 block of State Street (*see* Def. Ex. 101 at p. 2), the recording of the officers' activities related to this incident clearly indicates that the green SUV was located on the 1600 block of Park Street (*see* Def. Ex. 108, Track 2 at 2:00-2:10).

According to the police report, Hearn confirmed that he was the owner of the green SUV, and told the officers that he had loaned the vehicle to one of the residents of 1622 Park Street, who was present at the scene and identified as Elijah Brown. (*Id*.; *see also* Def. Exs. 102 & 103.) When questioned, Brown did not deny Officer Krokos's accusation that he had been involved in the theft of Corish's vehicle. (*See* Def. Ex. 102.) Brown further stated that there was a gun in his bedroom, and subsequently provided consent for an officer to search his residence. (*Id*.) Brown was arrested thereafter. (*Id*.)

During a statement he provided following his arrest, Brown implicated Defendant in the July 13, 2013 incident. (*Id*.) Brown stated that, in the morning of July 13, 2012, Hearn had loaned him the green SUV, and that he, Defendant, and two other males went to the City Gas and Diesel station, at which time one of the other males stole a woman's vehicle. (*Id*.) He further stated that he, Defendant, and the second male traveled back to the 1600 block of Park Street, at which time the other male gave Defendant a handgun. (Def. Ex. 102) When Corish and Nicholson confronted Brown and Defendant regarding the theft of the Dodge Stratus, Defendant threatened them with the handgun. (*Id*.) Brown's account of the incident corroborated many of the material facts set forth by Corish.

Defendant's name was provided to Detective Carter prior to his interview of Corish, at which time, Detective Carter compiled a photo array. (Hr'g Tr. at pp. 3-4.) At the suppression hearing, Detective Carter explained how he created the photo array. (*Id*. at pp. 4-5.) Detective Carter testified that he input Defendant's name into JNET, an internet-based law enforcement website that allows access to records and information, which produced a photograph of Defendant. (*Id*.

at p. 4.)  Detective Carter utilized JNET's functions to compile a photographic array of other individuals that had characteristics similar to those of Defendant.  (*Id*. at pp. 4-6; Gov't Ex. 1.)  Specifically, Detective Carter testified that, after inputting Defendant's name, JNET produced a picture of Defendant, and that, by selecting a link titled "similar images," the program generated a large pool of photographs of individuals who possessed similar physical attributes to those of Defendant.  (Hr'g Tr. at p. 4.)  From that pool, Detective Carter selected seven additional photographs of individuals to create the array.  (*Id*. at p. 5.)  The computer program merely generated the selection pool, and the photo array itself was created by the user.  (*See id*. at p. 4-5.)  Detective Carter utilized the program in the manner it was designed to be used.  (*See id*.)[7]

---

[7] At the hearing, Detective Carter provided the following explanation as to the methodology he employed to create the array:

Q:   And once you put [Defendant]'s information into the system, did it provide you with some biographical information?

A:   No, actually what happens is, you place [Defendant]'s name into the system.  His photograph comes up.  You click on the link "similar images" which coincide with [Defendant]'s physical description.

*   *   *

Q:   And then you clicked on this link that says, similar, and what does the computer program give you?

A:   It generated over 8000 males matching [Defendant's] description.

Q:   And once you had that body of photographs, what did you do with that?

A:   Then what I do is, I just compile the array based on [Defendant's] physical description.

Q:   So the computer gives you a group of thousands of pictures that are similar to [Defendant]'s biographical information, and then do you or the computer select the photographs that are actually in the array?

A:   I select [seven additional] photos.

(continued...)

At the time of her interview, Corish was unaware that Detective Carter had already been given Defendant's name. During a statement she gave to Detective Carter at 12:00 p.m. on July 13, 2012, Corish provided the following description of that individual:

> Q: Can you describe [the person that pulled a gun on you]? Let's start with his complexion.
>
> A: Dark skinned.
>
> Q: And hairstyle[?]
>
> A: Well cut or a bald head.
>
> Q: Okay. . . . [A]ny facial hair?
>
> A: Yes.
>
> Q: Tell me about it.
>
> A: I think he had a goatee beard.
>
> Q: Okay. Full or half goa . . . a full coming down on both sides of his face or just under his chin, under his lip?
>
> A: . . . I couldn't really tell.
>
> &ast; &ast; &ast;
>
> Q: Okay. What about his height?
>
> A: Between five-ten and six foot maybe.
>
> Q: Okay.
>
> A: Um kinda thick. Chubby a little bit. I'm not sure if I can remember.
>
> Q: What about his buil[d]?
>
> A: I know he was broad and wide . . .
>
> Q: Okay.
>
> A: I don't know it was just little heavy set I think. I can't . . . like I couldn't really tell it was dark.

(Def. Ex. 104.)

---

[7] (...continued)

(Hr'g Tr. at pp. 4-5.)

Corish was shown an eight-photograph photo array,[8] which had been compiled by Detective Carter through the use of JNET and contained a photograph of Defendant. (Hr'g Tr. at p. 7.)[9]  Each individual depicted in the photo array was an African-American male of roughly the same complexion and age, had facial hair that ranged from a goatee to full beard, and had short hair. (*See* Gov. Ex. 1.)  None of the individuals had any distinguishing marks or features. (*Id.*)  Detective Carter instructed Corish to "identify anyone on th[e] photo array." (Hr'g Tr. at pp. 7-8.)  Within "a matter of seconds," Corish identified the picture of Defendant as the "person that pointed the gun at her" with no hesitation or uncertainty. (*Id.* at p. 8.)  Corish indicated that she was 100-percent sure of her identification. (*Id.*)

Following the arrests of Defendant and Brown, the case was referred to the Bureau of Alcohol, Tobacco, and Firearms for possible federal prosecution in connection with the weapons offenses. (Hr'g Tr. at pp. 21-22.)  At the suppression hearing, Special Agent Brian LePrell testified on behalf of the government as to his investigation into the matter, which involved an interview of Corish and Nicholson. (*Id.* at p. 22.)  Agent LePrell testified that he had interviewed Corish and Nicholson

---

[8]  The court is aware that, on cross-examination, Detective Carter testified that Corish provided her statement to him *after* she was shown the photo array containing Defendant's photograph. Based on review of the record, the court believes Detective Carter misspoke regarding this sequence as it appears that Corish gave her statement prior to being shown the array. (*See* Hr'g Tr. at pp. 13-14.) Moreover, had Corish given her verbal description after being shown the photo array, Defendant's challenge, namely that the July 13, 2013 photo array as compiled did not match Corish's verbal description, would be meritless *ab initio*. Nevertheless, the chronology in this regard is immaterial to the disposition of the instant motion, as the court finds that Corish identified Defendant under circumstances that were neither unnecessarily suggestive or otherwise unreliable.

[9]  At the hearing, Detective Carter testified that he intended the photo array to reflect pictures similar to that of Defendant rather than pictures more closely matching the description given by Corish. (Hr'g Tr. at 13.)

together on November 21, 2012.  (Hr'g Tr. at pp. 22, 37.)[10] During the interview, which was the first occasion Nicholson was interviewed by law enforcement regarding the July 13, 2012 incident (*Id.* at p. 36), Corish stated that she had no prior personal knowledge of Defendant or Brown prior to July 13, 2012 (*Id.* at pp. 22-23). Nicholson, however, informed Agent LePrell that he knew Defendant from "growing up in Harrisburg."  (*Id.* at p. 23.)

Based on Nicholson's indication that he was acquainted with  Defendant independent of the July 13, 2012 incident, Agent LePrell showed only Corish a photo array that he had created using the same methodology as Detective Carter.  (*Id.* at p. 28.)[11]  In selecting the seven comparison photographs for the array, Agent LePrell testified that he was looking for physical characteristics to closely resemble those depicted in Defendant's photograph, rather than to resemble the physical description that Corish had given during her first interview.  (*Id.* at p. 25.)  Agent LePrell asked Corish whether she recognized anybody depicted in the photographs.  (*Id.* at p. 27.) Once again, within twenty seconds, Corish identified the picture of Defendant as being the "gentleman that pointed the gun at her," with no hesitation or uncertainty. (*Id.*)  Agent LePrell testified that neither he nor Nicholson gave any input into Corish's selection of Defendant's photograph.  (*Id.* at p. 28.)

## III.          __Legal Standard__

---

[10]  Agent LePrell testified that it is "not extraordinary" to interview people together.  (Hr'g Tr. at p. 37.)

[11]  Agent LePrell explained that he did not show Nicholson the photo array "[b]ecause [Nicholson] said he knew [Defendant] a good portion of his life and was sure that's who it was."  (Hr'g Tr. at p. 28.)

Defendant moves to suppress the two out-of-court identifications made by Corish, contending that the photo arrays were impermissibly suggestive and created a substantial risk of misidentification. A challenge to the legitimacy of a pretrial identification procedure implicates the Due Process Clause. *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) (citing *Foster v. California*, 394 U.S. 440, 442 (1969); *Neil v. Biggers*, 409 U.S. 188, 196 (1972) (holding that a pretrial identification of a defendant is inadmissible at trial if the identification was made at a confrontation that "was so unnecessarily suggestive and [conducive] to irreparable mistaken identification" that the defendant was denied due process of law)).

The Fifth Amendment provides, in pertinent part, that: "No person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. An identification procedure violates this right to due process if it is both (1) unnecessarily suggestive, and (2) creates a substantial risk of misidentification. *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)).

To determine whether a photo array is unnecessarily suggestive, a court considers factors including the size of the array, the manner of the presentation by the law enforcement officers conducting the identification procedure, and the details of the photographs themselves. *United States v. Rogers*, 491 F. Supp. 2d 530, 535 (M.D. Pa. 2007) (citing *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991), *superseded on other grounds by statute* 28 U.S. C. § 2254(d)). Defendant bears the burden of proving the identification procedure was unnecessarily suggestive. *Lawrence*, 349 F.3d at 115 (citing *Reese*, 946 F.2d at 259). If the court finds that the procedure was unnecessarily suggestive, it must then determine whether the

identification was nonetheless independently reliable and did not create a substantial risk of misidentification. *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001); *see also Brownlee*, 454 F.3d at 139.

Whether an identification procedure creates a substantial risk of misidentification depends upon the totality of the circumstances, considering factors such as: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Brownlee*, 454 F.3d at 139 (citing *Brathwaite*, 432 U.S. at 199).

## IV.     Discussion

For the following reasons, the court finds that neither the July 13, 2012 nor the November 21, 2012 photo arrays were unnecessarily suggestive. Assuming *arguendo* that the photo arrays were unnecessarily suggestive, the court nevertheless finds, upon considering the totality of the circumstances, that neither photo array created a substantial risk of misidentification.

### A.     The Photo Array Was Not Unnecessarily Suggestive

As noted above, to determine whether a photo array is unnecessarily suggestive, a court considers factors including the size of the array, the manner of the presentation by the officials conducting the array, and the details of the photographs themselves. *Rogers*, 491 F. Supp. 2d at 535 (citing *Reese*, 946 F.2d at 260).

#### 1.   The Size of Each Photo Array

Turning first to the issue of size of the array, the court notes that an array with as few as six pictures is not *per se* unconstitutional. *United States v. Stevey*, Crim No. 05-CR-0232, 2006 WL 2038614, *4 (W.D. Pa. July 20, 2006) (citing *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994)). Moreover, the larger the number of photographs used in the array, the less likely it is that a minor difference will have a prejudicial impact on selection. *Sanchez*, 24 F.3d at 1262. In this case, both photo arrays viewed by Corish contained eight photographs. (Gov. Exs. 1 & 2.) Consequently, the photo arrays were large enough in size to avoid being unnecessarily suggestive based on this factor alone, and the court finds that this factor weighs in favor of the array's validity.

## 2. The Manner of Presentation by the Officials Conducting the Identification Procedures

Likewise, the court finds no evidence of prejudice in the array's manner of presentation. The manner of presentation of the photo array may be unnecessarily suggestive if an officer emphasizes a particular photograph or suggests a photograph the witness should identify. *Rogers*, 491 F. Supp. 2d at 535-36. However, an officer telling a witness that a suspect in the case is present in the photo array is not *per se* unnecessarily suggestive. *See United States v. McNeill*, Crim. No. 06-CR-0373, 2007 WL 2234516, *5 (W.D. Pa. Aug. 2, 2007) (finding that, where witness did not feel undue pressure to identify the criminal, the array was not unnecessarily suggestive even though the officer told the witness that a suspect was in the array).

In the matter *sub judice*, both Detective Carter and Agent LePrell instructed Corish to identify anyone whom she recognized. Neither law enforcement officer indicated that the suspect was in the array, nor did they suggest the suspect may not be depicted. Rather, Detective Carter and Agent LePrell asked Corish how

12

she knew the person she had identified, in response to which she indicated that she had identified the person who had threatened her with a handgun. The record is completely devoid of any evidence that either Detective Carter or Agent LePrell emphasized or suggested a particular photograph, or told Corish that a suspect who was otherwise identified was present in the array. Neither agent presented Defendant's photograph by itself or multiple times. Moreover, Agent LePrell testified that, although Nicholson was interviewed jointly with Corish, he did not do anything to influence her selection of Defendant. Consequently, the manner of presentation of the photo array was not unnecessarily suggestive, and this factor also weighs in favor of the array's validity.

### 3. <u>The Details of the Photographs Themselves</u>

Where, as here, there is no prejudice in the manner of the array's presentation, the "primary question is whether the suspect's picture is so different from the others that it suggests culpability." *Rogers*, 491 F. Supp. 2d at 536 (quoting *Reese*, 946 F.2d at 260). However, all photographs in the array need not "be uniform with respect to a given characteristic." *Stevey*, 2006 WL 2038614 at *4 (citing *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)). There is also no requirement that a suspect in a photo array be surrounded by people identical in appearance. *Id.* (quoting *Tavarez v. LeFevre*, 649 F. Supp. 526, 530 (S.D.N.Y. 1986)). The Third Circuit has held that an array was not impermissibly suggestive despite the fact that the defendant was the only individual with "long sideburns and a card revealing his name and height." *Reese*, 946 F.2d at 260 ("[P]hotographic displays have been held not unduly suggestive even when certain characteristics of the defendant or his photograph are set apart from others."); *see also United States v. Sanders*, 275 F.

App'x 121, 123-24 (3d Cir. 2008) (finding not unduly suggestive an array in which defendant was the only one not wearing a shirt).

Unlike the defendant in *Reese*, Defendant does not argue that he possessed a unique characteristic apparent from the photographs that was not exhibited by *any* of the other fourteen individuals included in the arrays as comparisons. *See Reese*, 946 F.2d at 260. Rather, Defendant argues that several pictures in the photo arrays did not match Corish's description of the suspect. (Doc. 48 at ¶ 11.) Corish described the suspect as between 5'10" and 6' tall, dark skinned, with short hair or a bald head, with facial hair, and as appearing broad, wide, and "heavy." (Def. Ex. 104.) According to Defendant, the description neither approximates his appearance nor matches the photographs which were later shown to Corish in the photo array. Moreover, Defendant argues that his "size, hair[,] and color made him stand out from the other photographs." (Doc. 49 at p. 4.) Defendant asserts that he is 6'8" and weighs almost 280 pounds. (*Id.* at p. 5.)

Both Detective Carter and Agent LePrell testified that they compiled the photo arrays shown to Corish by using a computer program designed to select individuals with characteristics similar to those of Defendant. (Hr'g Tr. at pp. 4-5, 23-24.) The photographs need not show individuals with identical characteristics; rather, they must merely depict similar enough characteristics so that the suspect's picture does not stand out from the others in a way that would suggest culpability. *Rogers*, 491 F. Supp. 2d at 536 (citing *Reese*, 946 F.2d at 260); *Sanders*, 275 F. App'x at 124.

Defendant argues that the processes Detective Carter and Agent LePrell used to create the array is suspect because the law enforcement officers entered the

Defendant's name, which they had gathered from sources independent from Corish, into the computer program, rather than compiling an array based on the description that Corish gave in her initial interview. (Doc. 49 at p. 5.) The court does not find it unduly suggestive to use such a method. Detective Carter and Agent LePrell learned Defendant's name from Hearn and Brown during the course of the Harrisburg Police Department's investigation into the July 13, 2012 incident. There is no evidence to suggest that Corish simply picked out the person whose name was given. Indeed, Corish did not know Defendant's name prior to the investigation. At the time she was shown the photo array by Detective Carter, she was instructed to pick out anyone she recognized, which she later identified as the individual who had threatened her with a firearm. The facts that the creators of the arrays learned of Defendant's identity through sources independent of Corish and that Corish's initial description was arguably inconsistent with the photographs compiled in terms of height and extent and style of facial hair are of no moment. Accordingly, that the array was created from photographs gathered in a manner not entirely based upon Corish's description does not render the photo arrays unduly suggestive.

Moreover, the court has viewed the photo arrays and finds Defendant's argument on this point without merit. Given the totality of the circumstances discussed *infra*, Defendant's claim that the heights and weights of the comparison individuals in the photo array do not closely enough match his own characteristics does not rise to the level of unnecessarily suggestive. *See Lawrence*, 349 F.3d at 116 (holding that a lineup where the defendant was the only one pictured shirtless and wearing jewelry, when jewelry was part of the description of the assailant, did not deny due process because the totality of the circumstances established the reliability

of the identification); *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (holding that a swollen eye or a particular hair style may be striking enough differences to create unnecessary suggestion, but mere differences in facial characteristics are not); *McNeill*, 2007 WL 2234516 at *5 (holding that "minor physical differences," such as appearing older than the comparison individuals in the array, is not unnecessarily suggestive, given the totality of the circumstances); *Stevey*, 2006 WL 2038614 at *4 (holding that a lineup was not unnecessarily suggestive, given the totality of the circumstances, where a defendant was the only one pictured who had red hair). "To allow . . . minor differences to vitiate an otherwise valid pretrial identification procedure would place an undue burden on law enforcement officers to 'search for identical twins in age, height, weight, or facial features' when administering such procedures." *Rogers*, 491 F. Supp. 2d at 536 (quoting *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002)).

Specifically, in the July 13, 2012 photo array created by Detective Carter, all eight of the photographs depict individuals of similar skin color with short hair. The ages of the individuals appear to vary only slightly, if at all. The majority of the individuals appear to be of a similar weight. While Defendant argues that his height is distinctive, such a unique physical attribute is not clear from the photographs selected, as each photograph depicts only the individuals' face and neck. Moreover, the background of each photograph appears to be similar, and the photograph of Defendant is of the same general quality, size, and appearance as the comparison photographs. Defendant's strongest argument, namely that four of the eight photographs included in the array depict individuals with different style facial hair, is similarly unconvincing, as such minor deviations do not act to make an

otherwise valid photo array "unduly suggestive."  *See McNeill*, 2007 WL 2234516 at *6; *Grubbs*, 982 F.2d at 1490.  Accordingly, the court finds that, when compared to the other seven photographs in the July 13, 2012 array, the details of Defendant's photograph itself are not so unique as to suggest culpability or render the array unnecessarily suggestive.

The November 21, 2012 photo array presents an even weaker example of purported "suggestiveness."  In that photo array, all eight photographs again depict individuals of roughly the same skin color with short hair.  The ages of the individuals depicted appear to be similar, and the majority appear to be of a similar weight.  The court does not find that Defendant's height or weight appears distinguishable.  Additionally, all of the comparison photographs are of males who have facial hair, most having full beards.  The backgrounds of the photographs appear to be similar, and the photograph of Defendant is of the same general quality, size, and appearance as the comparison photographs.  The court finds that, when compared to the other seven photographs in the November 21, 2012 array, the details of Defendant's photograph itself are not so unique as to suggest culpability.

In short, given the circumstances surrounding Corish's identification of Defendant, the minor differences between the photograph of Defendant and the seven comparison photographs in each of the two photo arrays neither suggested culpability nor created an unnecessarily suggestive procedure.

## B. The Photo Array Did Not Create a Substantial Risk of Misidentification

Even assuming, *arguendo*, the identification procedures were unnecessarily suggestive, a violation of due process only occurs if there is also a substantial risk of misidentification. *Brownlee*, 454 F.3d at 137, 139. Whether an identification procedure creates such a risk depends on the totality of the circumstances, considering the following factors: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 139.

### 1. Opportunity of Corish To View the Suspect at the Time of the Crime

Defendant argues that Corish had only a "fleeting" opportunity to view the person committing the crime, and was only able to observe the suspect for a matter of seconds in the midst of a frightening situation and in a "dark neighborhood." (Doc. 49 at p. 5.) Certainly, the circumstances surrounding Corish's encounter with the individual who had threatened her with a handgun were less than optimal. However, at the time Corish confronted the suspect about her stolen vehicle, there is nothing to suggest she had anything less than a clear and unobstructed view of the individual. Moreover, while the record does not clearly reflect the amount of time that Corish observed the suspect, the court can infer that, based upon the recording of her emergency call, Corish had an unobstructed view of the suspect for nearly thirty seconds before being threatened with the handgun. (Def. Ex. 108.) Although Corish's opportunity to view the individual was brief, there is nothing to suggest that her opportunity to view the individual created a substantial risk of misidentification.

### 2.  Corish's Degree of Attention

Although Corish was understandably frightened during the incident, she was clearly focused on the individual as she tried to gather information regarding the theft of her vehicle.  There is nothing in the record to suggest that Corish was anything but attentive during her encounter with the individual who threatened her with a handgun.

### 3.  The Accuracy of Corish's Description of the Suspect

Defendant argues that Corish's verbal description was so inaccurate as to create a substantial risk of misidentification.  During Detective Carter's interview of Corish, Corish described the suspect as dark skinned, with a "well cut hairstyle" or bald head and goatee-style beard, was between 5'10" and 6' tall, and was "broad and wide." (Def. Ex. 104 at p. 6.)  With the exception of underestimating Defendant's height and style of facial hair, Corish gave a fairly accurate description of Defendant.  Moreover, any discrepancy between the initial description and the photograph of the individual ultimately identified by Corish as the perpetrator was cured by Corish's selection of Defendant from both arrays under constitutionally fair conditions.  *See supra* Part IV.A.  Neither the arrays themselves nor the procedures used in connection therewith improperly suggested Defendant's photograph to Corish.  Accordingly, Corish's selection of Defendant's photograph tends more to show that her verbal articulation of Defendant's description was problematic, not that the accuracy of her description, or lack thereof, created a substantial risk of misidentification.

### 4.  Level of Certainty Demonstrated by Corish at the Confrontation

Corish displayed a high level of certainty during both the July 13, 2012 and November 21, 2012 identification procedures. During the July 13, 2012 identification procedure, Corish was instructed to select and identify any individual in the photo array whom she recognized. Within "a matter of seconds," Corish identified the picture of Defendant as being the "person that pointed the gun at her" with no hesitation or uncertainty. (Hr'g Tr. at p. 8.) Corish indicated that she was 100-percent sure of her identification. (*Id.* at p. 8.) Similarly, during the November 21, 2012 identification procedure, Agent LePrell asked Corish whether she recognized anybody depicted in the array. (*Id.* at p. 28.) Agent LePrell testified that, within twenty seconds, Corish identified the photograph of Defendant as being the "gentleman that pointed the gun at her" with no hesitation or uncertainty. (*Id.* at p. 27.) Accordingly, the level of certainty demonstrated by Corish at both identification procedures do not support a conclusion that there was a substantial risk of misidentification.

## 5. <u>Length of Time Between the Crime and the Confrontation</u>

Corish viewed the first photo array containing Defendant's picture only hours after the incident. This time lapse is short enough to ensure the reliability of Corish's identification. If taken alone, the second identification procedure, which occurred over four months after the incident, may weigh in favor of finding a substantial risk of misidentification. However, as the November 21, 2012 interview was not the initial identification, the consistency between the first and subsequent identifications further weighs in favor of a finding of independent reliability of Corish's identification.

Accordingly, a consideration of the totality of the circumstances shows that Corish's identifications are independently reliable, notwithstanding any possibility of unnecessary suggestiveness in the identification procedure.

## V.        **Conclusion**

An identification procedure violates due process only if the defendant proves it was unnecessarily suggestive and the court finds that this created a substantial risk of misidentification. *Brownlee*, 454 F.3d at 137. Here, Defendant has not met his burden of proving the identification procedure was unnecessarily suggestive. Furthermore, the totality of the circumstances establishes the independent reliability of Corish's identifications. Accordingly, neither out-of-court identification violated Defendant's Fifth Amendment due process rights, and Defendant's motion to suppress the out-of-court identifications and to preclude an in-court identification will be denied.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated: February 22, 2013.